**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DENISE E.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 21 C 1211** |
| **v.** | ) | |
| | ) | **Magistrate Judge Finnegan** |
| **KILOLO KIJAKAZI, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Denise E. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment in support of affirming the decision. After careful review of the record and the parties' respective arguments, the Court affirms the ALJ's decision.

## BACKGROUND

Plaintiff applied for DIB and SSI on July 8, 2015, alleging in both applications that she became disabled on April 9, 2010 due to fibromyalgia, carpal tunnel syndrome, and

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

depression. (R. 189, 192, 241). She subsequently amended the alleged disability onset date to March 29, 2013. (R. 32, 432, 456, 612). Born in 1969, Plaintiff was nearly 46 years old at the time of her applications, making her a younger person. (R. 189); 20 C.F.R. § 404.1563(c); 20 C.F.R. § 416.963(c). She completed two years of college. (R. 242, 459). Plaintiff lived with her teenage son in an apartment located above her father's place until the summer of 2019. (R. 42, 51, 458). She then moved in with her niece. (R. 453, 458). Her nephew and son also live with them. (R. 458). Plaintiff spent seven years as a customer service representative for an insurance company before taking a position as an insurance claims processor in July 1997. She held that job until April 2010 when she was fired for poor attendance she attributes to severe pain. (R. 35, 46, 225, 242, 297, 478). Though Plaintiff tried to do some babysitting work in 2012 and 2015, it did not rise to the level of substantial gainful activity. (R. 16, 34, 203, 242).[2] Plaintiff's "date last insured" is June 30, 2016—the date by which she must prove disability in order to be eligible for social security disability benefits. (R. 431); *Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010).

The Social Security Administration denied Plaintiff's DIB and SSI applications initially on December 3, 2015, and again upon reconsideration on April 4, 2016. (R. 58-107). Plaintiff requested a hearing and appeared before administrative law judge David Skidmore (the "ALJ") on August 23, 2017. (R. 29, 124). The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert ("VE") Thomas F. Dunleavy. (R. 29-57). On December 6, 2017, the ALJ found that Plaintiff has severe

---

[2]     Plaintiff testified that she also "tried to do babysitting" at some point after the first administrative hearing in August 2017 (*see infra*) but was unable to continue. (R. 437, 459). She had self-employment earnings of $3,278.00 in 2015 and $8,888.00 in 2016. (R. 621, 625).

impairments in the form of fibromyalgia, obesity, and lumbago but that they do not meet
or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R.
16-18).  The ALJ concluded that Plaintiff is not disabled because she retains the residual
functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b)
and § 416.967(b), except for no concentrated exposure to extreme cold, vibrations,
dangerous machinery, or unprotected heights, which the VE testified would allow her to
engage in her past relevant work as a claims clerk.  (R. 19-21).

Plaintiff appealed to this Court, which reversed the ALJ's decision and remanded
the case for further consideration.  (R. 522-35); *Denise E. v. Saul*, No. 18 C 8190, 2020
WL 2557402 (N.D. Ill. May 20, 2020).  On July 21, 2020, the Appeals Council vacated the
decision of the Commissioner and remanded the case to the ALJ for additional
proceedings.  (R. 536-40).  The ALJ held a second hearing on November 10, 2020, at
which Plaintiff, again represented by counsel, and VE Megan Cameron testified.  (R. 451-
88).  On December 29, 2020, the ALJ issued a second opinion denying Plaintiff benefits.
(R. 430-44).

The ALJ found that Plaintiff has: severe impairments in the form of fibromyalgia,
obesity, and lumbago with sciatica; non-severe impairments in the form of acid reflux,
asthma, hypertension, and insomnia; and non-medically determinable impairments in the
form of carpal tunnel syndrome and depression.  The ALJ determined that Plaintiff's
impairments do not meet or equal any of the listed impairments in 20 C.F.R. Part 404,
Subpart P, Appendix 1.  (R. 433-34).  The ALJ again concluded that Plaintiff has the RFC
to perform light work with no concentrated exposure to extreme cold, vibration, or hazards
such as dangerous machinery or unprotected heights.  (R. 435).  In addition to these

3

restrictions, the ALJ determined that Plaintiff cannot climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. (*Id.*). Finally, the ALJ accepted the VE's testimony that a person with Plaintiff's background and this RFC could perform Plaintiff's past relevant work as a claims clerk, and therefore again concluded that she was not disabled under the Social Security Act. (R. 443-44, 482-83). Plaintiff did not file exceptions to the ALJ's opinion, and the Appeals Council did not assume jurisdiction, making it the final decision of the Commissioner after remand. (Doc. 1, at 2 ¶¶ 8, 13-15); 20 C.F.R. § 404.984(a), (d). Plaintiff again appealed to this Court.

In support of her request for reversal or remand, Plaintiff argues that the ALJ repeated several errors from his initial decision, including: (1) improperly evaluating her subjective statements regarding the limiting effects of her fibromyalgia; (2) erroneously weighing the opinion evidence of record; (3) failing to account for all of her limitations stemming from her impairments in determining her RFC; and (4) failing to support his finding that she could sustain her past relevant work. For the reasons discussed below, the Court finds that the ALJ did not commit reversible error and the decision is supported by substantial evidence.

## **DISCUSSION**

### A.    **Standard of Review**

Judicial review of the Commissioner's final decision is authorized by section 405(g) of the Social Security Act (the "SSA"). *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir. 2004) (internal citation omitted). Nor may it "displace the ALJ's judgment by

4

reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)).  The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)).  Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover DIB under the SSA, a claimant must establish that she is disabled within the meaning of the Act.[3]  *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016).  A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can

---

[3]    Because the regulations governing DIB and SSI are substantially identical, for ease of reference, the DIB regulations are cited herein.

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F.Supp.2d 618, 630 (N.D. Ill. 2009).   In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing "whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy."  *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (citing 20 C.F.R. § 404.1520).   If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five.   *Id*.

## C.    Analysis

### 1.    Subjective Symptom Evaluation

Plaintiff argues that the case must be reversed or remanded because the ALJ improperly evaluated her subjective statements regarding the limiting effects of her fibromyalgia pain and fatigue.  (Doc. 19, at 8-10).  Specifically, Plaintiff claims that the ALJ once again demonstrated a misapprehension of fibromyalgia—a disease with entirely subjective symptoms—by relying on purportedly unremarkable or normal objective findings to reject Plaintiff's statements about the severity of her symptoms.  (*Id.* at 8-9).  According to Plaintiff, the ALJ "simply narrated the medical record," listing example after example of normal gait, normal reflexes, normal and appropriate affect, and lack of acute

distress, without building a logical bridge between such evidence and his conclusion that her limitations from fibromyalgia are not as severe as alleged. (*Id.*). The Court disagrees.

As this Court underscored in its May 2020 order, "often there is no objective medical evidence indicating the presence or severity of fibromyalgia." *Apke v. Saul*, 817 F. App'x 252, 257 (7th Cir. 2020); *see also Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (explaining that it is difficult to determine the severity of a claimant's fibromyalgia "because of the unavailability of objective clinical tests"). "In the absence of objective medical evidence, the severity of fibromyalgia symptoms may be evaluated based on the claimant's subjective statements regarding the impairment." *Apke*, 817 F. App'x at 257 (citing SSR 12-2p & SSR 16-3p). The ALJ follows a two-step process for evaluating a claimant's subjective statements regarding her symptoms and limitations from fibromyalgia. First, the ALJ considers whether there are medical signs and findings that show the individual has a medically determinable impairment(s) that could reasonably be expected to produce the individual's alleged pain or other symptoms. SSR 12-2p, 2012 WL 3104869, at *5 (July 25, 2012). If there is such an impairment, the ALJ must "evaluate the intensity and persistence of the person's pain or any other symptoms and determine the extent to which the symptoms limit the person's capacity for work." *Id.*

"If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms," the ALJ should consider "all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." *Id.*; *see also Gwendolyn*

7

*B. v. Saul*, No. 20 C 3244, 2021 WL 1812879, at *8 (N.D. Ill. May 6, 2021) ("[T]o determine the credibility of allegations of disabling pain, an ALJ may consider several factors, including objective medical evidence and any inconsistencies between the allegations and the record.") (quoting *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020)). An ALJ's assessment of a claimant's subjective complaints is given "special deference" and will be reversed only if "patently wrong." *Apke*, 817 F. App'x at 257.

In a Function Report from September 2010, Plaintiff stated that her fibromyalgia limits her ability to work due to great fatigue and extreme pain all over, which makes it difficult to walk, reach, bend, and stand. (R. 215). Plaintiff further stated that she suffers from muscle stiffness and restricted mobility and that her pain is "widespread and relentless," causing her to feel "very weak and exhausted." (*Id.*). In addition, Plaintiff noted trouble lifting more than eight pounds, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, and using her hands, as well as issues with memory, task completion, concentration, and understanding. (R. 220).

Plaintiff also completed a Fatigue Questionnaire and Pain Questionnaire on February 8, 2016. (R. 268-77). She stated that she is in pain "all day." (R. 275). Her severe pain and fatigue: limit her ability to bathe on some days; prevent her from carrying out full chores and require her to spend all day on a single chore; cause her to sleep poorly and need to nap during the day; and force her to enlist help from family members "with everything." (R. 268-70). Plaintiff also alleged that repetitive movement of any kind causes her to be bedridden for the remainder of the day, as consistent movement aggravates and tightens her muscles. (R. 268, 270). Plaintiff estimated that she can walk two city blocks, stand for three to five minutes, and sit for thirty minutes at one time. (R.

277). According to Plaintiff, her pain results in distraction and forgetfulness, forcing her to take breaks and to write things down. (R. 269). As a result of her conditions, Plaintiff suffers from muscle weakness and stiffness, bad stomach aches, extreme headaches that last for eight to ten days every month, depressive feelings, and daily tears. (R. 271-72, 275).

At the November 10, 2020 hearing before the ALJ, Plaintiff testified that her pain has worsened since the 2017 administrative hearing, and she never goes anywhere alone. (R. 458, 463-64). The pain is most prominent in her neck, back, hip area, knees, and elbows. (R. 463). During her "chronic days" (also referred to as flare-ups or episodes), everything hurts and she is unable to move or get out of bed for the entire day. (R. 464). She has had episodes of incontinence as a result. (R. 465). She takes Ibuprofen every day, Amitriptyline at night (as well as over-the-counter sleeping pills at times), and muscle relaxers during "flare-ups." (R. 469, 478). Plaintiff's sister helps to put her in the bath twice a week and rubs her down with Bengay or Biofreeze to slow her pain down. (R. 477). Plaintiff also uses a cane that she purchased for herself on her flare-up days, as well as to help her "walk a little way" or stand for a long time on non-flare-up days. (R. 466-67). She also uses the cane when she leaves the house about a couple of times per month. (R. 467). Plaintiff estimated that she can lift about five pounds, but sometimes it is hard for her to grasp, hold, and carry items. (R. 471). Additionally, Plaintiff testified that she cannot do a lot of typing or texting because of spasms and pain in her hands. (R. 475). She estimated that she can stand for no more than ten minutes at a time. (R. 471). Plaintiff testified that she continues to be unable to sleep, causing her to be moody, cranky, and exhausted. (R. 472). Plaintiff testified that she has to plan

her life around pain, which is depressing, and she has memory and concentration problems due to her being focused on her physical pain.  (R. 472-73, 475).

As the Commissioner correctly contends, the ALJ was permitted to, and did, consider the extent to which these allegations were consistent with the objective medical evidence.  *Susan G. v. Kijakazi*, No. 20 C 6110, 2023 WL 2525495, at *7 (N.D. Ill. Mar. 15, 20213) ("[W]hen evaluating fibromyalgia or any other condition, the ALJ must not reject complaints about pain *solely* because of the objective evidence, but the ALJ is entitled to consider the objective evidence as one factor in evaluating a plaintiff's subjective symptom reports.") (citing 20 C.F.R. § 404.1529(c)(2)).  For example, Plaintiff made multiple statements about her limitations in walking due to her fibromyalgia (R. 436): in the September 2010 Function Report, she stated that her fibromyalgia pain makes it hard to walk (R. 215); in the February 2016 Pain Questionnaire, she stated that she can only walk two blocks (R. 277); at the August 2017 hearing, she testified that she has tried to walk about a block and a half without her hip and lower back hurting (R. 40); and at the November 2020 hearing, she testified that, during flare-ups, she usually needs help going to the bathroom because she can "barely walk" and also uses a cane.  (R. 465-66).

Yet Plaintiff routinely presented to her primary care physician, Kishore Khankari, M.D., with a normal gait, and she did not mention difficulty walking at a single appointment with Dr. Khankari or her treating rheumatologist Dennis J. Levinson, M.D. between September 2012 and September 2020.  (R. 320-22, 331-47, 380-87, 400, 410-24, 646-55).  In fact, Dr. Khankari noted "walking advised" at an appointment in January 2015. (R. 336).  Three months later, at an April 20, 2015 appointment with Dr. Levinson, Plaintiff

10

reported that she was "able to ambulate on the flat [ground]" and only had problems with stairs.  (R. 320).  And, in a questionnaire that Plaintiff filled out for a December 1, 2015 well-woman exam with Dr. Khankari, she also stated that her exercise activity consists of 30 minutes of activity two days per week, which she characterized as "stroll[ing]."  (R. 389).  Notably, the only mention of a stiff gait came at the November 12, 2015 consultative exam, which the ALJ noted was approximately three weeks after, as well as three weeks before, Dr. Khankari documented a normal gait at appointments on October 20, 2015 and December 1, 2015.  (R. 373, 380, 384).

The ALJ also noted discrepancies between Plaintiff's statements regarding her issues with memory and concentration stemming from her fibromyalgia and the objective medical evidence.  (R. 436-39, 442).  The record includes several allegations regarding Plaintiff's alleged problems with concentration, including: her statement in the 2010 Function Report that she has trouble with remembering, completing tasks, concentration, and understanding (R. 220); her allegation in the 2016 Fatigue Questionnaire that her pain results in distraction and forgetfulness, which forces her to take breaks, write things down, and receive reminders from family members (R. 269); and her testimony at the November 2020 hearing that she has memory and concentration problems because she is preoccupied with her physical pain.  (R. 475).  But there is no indication that Plaintiff ever complained about these alleged concentration issues to either Dr. Khankari or Dr. Levinson, and as the ALJ noted, Dante Pimentel, M.D. found that she was able to stay on task and concentrate throughout the November 2015 consultative examination.  (R. 373, 439).  The ALJ also noted that Dr. Pimentel found Plaintiff "capable of responsibly managing funds in her own interest" (*id.*), which "requires significant cognitive facilities

such as performing calculations, making financial decisions, dealing with financial institutions, and managing one's personal checking and/or savings accounts."  (R. 439).

The ALJ did not commit reversible error in pointing out these discrepancies.  *Ellen B. v. Saul*, No. 19 C 2389, 2020 WL 1912228, at *5 (N.D. Ill. Apr. 20, 2020) (ALJ properly acknowledged plaintiff's reported pain "but then looked at additional medical evidence to determine whether Plaintiff's functioning was truly limited by the reported pain, identifying numerous medical records to suggest it was not as limited as Plaintiff alleged"); *Gwendolyn B.*, 2021 WL 1812879, at *8 ("[D]iscrepancies between the objective evidence and self-reports may suggest symptom exaggeration.") (citations omitted); *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 n.5 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis.").

Moreover, the ALJ did not reject Plaintiff's statements solely based on the objective evidence but also pointed to inconsistencies in Plaintiff's own self-reports.  (R. 438-39). For instance, the ALJ noted that despite Plaintiff's allegations of disabling pain and depression, she reported that her "[m]ood ha[d] been good" and that she was "overall doing well" at appointments with Dr. Khankari in September 2012, March 2013, November 2013, and April 2014 (R. 337, 339, 341, 346), and she reported feeling "generally well" at appointments in January and July 2015.  (R. 331-35).  The ALJ also noted that, in March 2016, Plaintiff reported to Dr. Khankari that her back pain had been so severe that she was having difficulty standing for the previous three months.  (R. 410, 440).  Yet, despite alleging a disability onset date of March 29, 2013, none of Plaintiff's complaints to her

doctors between March 2013 and March 2016 approach this level of severity. (R. 320-22, 333-41, 380-85). Nor does the Court find it unreasonable that the ALJ queried "the potential of an increase in the severity of her complaints when seeking reports relating to her disability" given Plaintiff's: (1) "aching everywhere and moaning with pain" when she sought a disability evaluation from Dr. Khankari in August 2017; and (2) tearfulness when requesting a disability questionnaire from Dr. Levinson in April 2016 (R. 400, 423, 440-42), when the longitudinal treatment record otherwise does not reflect these types of manifestations. The ALJ did not err by noting these discrepancies in assessing Plaintiff's credibility.

The ALJ also found that Plaintiff's description of the severity of her symptoms was belied by the limited medical treatment reflected in the record. (R. 441-42); *see* SSR 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017) ("[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints . . . we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."). The ALJ found it "compelling" that Plaintiff "received very little treatment for several years" after she requested that Dr. Levinson complete a disability questionnaire on her behalf in April 2016. (R. 441-42). Plaintiff did not return to see Dr. Levinson after that. (R. 442). Additionally, after seeking a disability evaluation from Dr. Khankari in August 2017, Plaintiff did not return to see him for nearly two years. The ALJ acknowledged Plaintiff's testimony that she did not continue treatment with Dr. Levinson because certain medication he prescribed was not being covered by her insurance.[4] (R. 436-37, 441);

---

[4] According to Dr. Levinson's treatment note from April 20, 2015, Plaintiff reported that she was unable to take Savella, which Dr. Levinson had prescribed at the initial appointment the prior month,

*see Roy R. v. Kijakazi*, No. 19 CV 1687, 2022 WL 1185601, at *14 (N.D. Ill. Apr. 21, 2022) (An ALJ must consider a claimant's "reasons for not seeking medical treatment before drawing negative inferences from it, including for example a lack of health insurance or inability to pay."). But the ALJ concluded that Plaintiff's limited treatment post-2017 "cannot be explained entirely" by her alleged lack of access to certain health insurance coverage and that her description of the severity of her impairments does not comport with such limited treatment. (R. 441). Plaintiff does not challenge this conclusion. *See Underwood v. Saul*, 805 F. App'x 403, 406 (7th Cir. 2020) (arguments not raised before the district court are waived).

Finally, the ALJ found that Plaintiff's performance of certain daily activities undermines her credibility regarding the extent of her limitations. (R. 437). Contrary to Plaintiff's objection that the ALJ improperly equated her ability to perform these daily activities with an ability to work a full-time job (Doc. 19, at 9-10), the ALJ simply noted that Plaintiff's claim of total disability is inconsistent with activities such as preparing simple meals and folding clothes. For example, Plaintiff stated in the 2010 Function Report that she could prepare her own simple meals for one to one and a half hours twice per week. (R. 217). Plaintiff later testified during the November 2020 hearing that, although family members have to prepare her meals during "flare-up days" (which Plaintiff estimates to be ten out of every thirty days), she is able to prepare light meals for herself on non-flare-up days. (R. 465-66). Even though it still takes her a while to do so, Plaintiff testified that she "can manage" and is able to "move around without a very little assistance [*sic*] on those days." (R. 466).

---

because of insurance. (R. 320, 322). Plaintiff's hearing testimony vacillated as to whether insurance did not cover a single medication or multiple medications prescribed by Dr. Levinson. (R. 39-40, 460).

The Court agrees with Plaintiff that some of the other activities cited by the ALJ do not necessarily undermine her complaints of pain and limitations. For example, the ALJ noted Plaintiff's statement in the 2010 Function Report that she could shop in grocery stores for up to an hour and a half once per month. (R. 218, 437). Plaintiff testified during the November 2020 hearing, however, that she has tried to shop and "can't do any of that" or has "a very hard time doing it" if she does. (R. 476).[5] Nonetheless, "not all of the ALJ's reasons must be valid as long as *enough* of them are." *Kaczmarek v. Berryhill*, No. 17 C 2785, 2018 WL 6192185, at *4 (N.D. Ill. Nov. 28, 2018) (quoting *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009)).

"The ALJ's credibility assessment need not be perfect; it just can't be patently wrong." *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013)). Ultimately, "[a] diagnosis of fibromyalgia, like any other diagnosis, does not dictate a finding of disability" and a "claimant's assertions of pain, taken alone, are not conclusive of a disability." *Gwendolyn B.*, 2021 WL 1812879, at *8; *see also Kaczmarek*, 2018 WL 6192185, at *3 ("nothing requires an ALJ to accept Plaintiff's testimony as true simply because her condition may have a subjective symptomology"). Viewing the record as a whole, the ALJ provided sufficient reasons, including discrepancies between Plaintiff's allegations and the objective evidence and discrepancies within her own statements, for discounting

---

[5] Although the ALJ derived the activities from the Function Report that Plaintiff completed on September 14, 2010—two and a half years prior to the amended onset date of March 29, 2013 (R. 437)—such evidence is "probative to the extent it sheds light on the nature and severity of [Plaintiff's] condition during the relevant period." *Farha T. v. Kijakazi*, No. 20 C 5638, 2022 WL 2073027, at *3 (N.D. Ill. June 9, 2022) (citation omitted); *see also Samuel v. Berryhill*, No. 17 C 4596, 2018 WL 1706370, at *3 (N.D. Ill. Apr. 9, 2018) ("The ALJ should consider the record as a whole, including pre-onset evidence . . . and post-onset evidence.") (quotations and citations omitted).

Plaintiff's complaints of disabling symptoms, and that decision is supported by substantial evidence.

### 2. Opinion Evidence

Plaintiff next argues that the ALJ erred in weighing the opinion evidence of record. She first challenges the ALJ's decision not to give controlling weight to the opinion of her treating rheumatologist, Dr. Levinson. A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as she provides an adequate explanation for doing so. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). That is to say, the ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(c)(2)-(6); *see Simila*, 573 F.3d at 515.

The ALJ provided valid reasons for discounting Dr. Levinson's opinion, including that it was unsupported by his own medical evaluations and other objective evidence in

the record, as well as the limited medical treatment Plaintiff received from Dr. Levinson. Plaintiff saw Dr. Levinson three times between March and May 2015. (R. 320-22). At a March 24, 2015 appointment, Plaintiff complained of diffuse aches and pains, poor sleep habits, migraines, and functional bowel syndrome. (R. 322). A physical exam showed diffuse tender areas of the back, neck, anterior chest, and medial aspects of the upper and lower extremities, but no active synovitis, and a neurologic exam was intact and normal. (*Id.*). Dr. Levinson assessed fibromyalgia and ordered Plaintiff to begin taking Savella and Neurontin, as well as to continue taking Elavil at bedtime (which was previously prescribed by Dr. Khankari). (R. 322, 336). Dr. Levinson also encouraged Plaintiff to exercise at least three to four times per week and work on reducing her weight. (R. 322).

When Plaintiff returned to see Dr. Levinson on April 20, 2015, she reported no improvement from her prescribed medication and indicated that she was unable to take Savella because of an insurance issue. (R. 320). Plaintiff's primary complaints were marked tenderness of the shoulder and hip girdle, particularly with activity, and she reported having problems lifting her arms and sometimes getting out of a chair. (*Id.*). She added that she was able to ambulate on flat surfaces but had to use a railing when on stairs. (*Id.*). On examination, Dr. Levinson found a limitation of extension in both shoulders over the head, with pain and "perhaps slight" muscle weakness. (*Id.*). Dr. Levinson found that Plaintiff's neck muscles were of adequate strength, her wall quadricep muscles were "perhaps" a level 3/5 on the left side and 4/5 on the right, while her distal strength was adequate. (*Id.*). Dr. Levinson stated that his basic concern was

inflammatory myopathy and he had "less concern about a fibromyalgia syndrome at this time."  (*Id.*).

The next month, on May 28, 2015, Plaintiff returned with complaints of diffuse low back pain and poor sleep habits.  (R. 321).  Although a physical exam showed some tenderness in the lumbosacral region, which was worse with extension and lateral rotation, a sciatic stretch test was negative and a neurologic exam of both lower extremities was normal.  (*Id.*).  Dr. Levinson also found that Plaintiff had good motor strength in both upper extremities, and he noted that there was no particular weakness in Plaintiff's neck muscles and her cranial nerves II through XII were intact.  (*Id.*).  Dr. Levinson stated that his assessment "remain[ed] primarily fibromyalgia" (despite his lesser concern about it at the last appointment), and he again prescribed Neurontin, as well as Norco as needed for back pain and Ambien at bedtime.  (*Id.*).

Plaintiff's next (and final) appointment with Dr. Levinson came nearly a year later, on April 7, 2016, when she brought a questionnaire to be filled out for disability insurance purposes.  (R. 400).  Plaintiff complained of diffuse aches and pains, poor sleep habits, and depression and anxiety, and she was "quite tearful throughout the interview."  (*Id.*). She also stated that she was not tolerating Neurontin, Flexeril was giving her more relief (though it was limited by Dr. Khankari to sleep medication), and she was only taking Amitriptyline at bedtime.  (*Id.*).  A physical exam showed tenderness in the upper and lower extremities, medial aspects of the elbows, knees, chest, and back.  (*Id.*).  Dr. Levinson assessed fibromyalgia "with considerable emotional overlay."  (*Id.*).  He re-prescribed Savella and Norco, as needed, and ordered Plaintiff to continue Flexeril and

Amitriptyline. (*Id.*). Finally, Dr. Levinson ordered Plaintiff to engage in a water exercise program through an arthritis foundation. (*Id.*).

That same day, Dr. Levinson completed Plaintiff's requested disability form, a Fibromyalgia Residual Functional Questionnaire. (R. 408-09). Dr. Levinson identified several signs and symptoms of Plaintiff's fibromyalgia, including multiple tender points, nonrestorative sleep, severe fatigue, morning stiffness, depression, numbness and tingling, lack of endurance, impaired concentration, anxiety, frequent severe headaches, cognitive impairment, and vestibular dysfunction. (R. 408). According to Dr. Levinson, Plaintiff's prognosis was "fair" but she experiences pain "all day every day" in her lumbosacral spine, cervical spine, chest, arms, hips, and legs, and she cannot stand, bend, or engage in repetitive movements. (R 408-09). When asked whether Plaintiff retains the functional ability to work in a competitive environment given her medical impairments, Dr. Levinson responded that she "cannot move at all." (R. 409). Additionally, he opined that Plaintiff is severely limited in her ability to handle workplace stress and her concentration and attention are frequently impacted by fatigue and pain. (*Id.*). She would also need to lie down at unpredictable intervals during a work shift and would be absent more than three times a month. (*Id.*).[6]

Plaintiff contends that the ALJ once again erred in rejecting Dr. Levinson's opinion by citing normal objective findings without explaining their relevance to fibromyalgia pain. (Doc. 19, at 10-11). The Court disagrees. While it is true that Dr. Levinson's treatment notes reflect some tenderness and limited extension at various exams, Plaintiff fails to

---

[6]     The questionnaire also asked Dr. Levinson whether, based upon his examinations, subjective and objective findings, and medical expertise, he found Plaintiff's descriptions of fatigue and pain to be credible. Dr. Levinson left the response blank. (R. 409).

explain how these findings support Dr. Levinson's conclusion that she has pain "all day every day" and "cannot move at all." (R. 408-09). While Dr. Levinson noted some diffuse tender areas at Plaintiff's initial appointment in March 2015, he encouraged her to exercise at least three to four times per week and to work on reducing her weight. (R. 322). Additionally, the April 2015 exam revealed a limitation of extension in both shoulders over the head, with pain and "perhaps slight" muscle weakness. (R. 320). But Dr. Levinson found that Plaintiff's neck muscles were of adequate strength, her distal strength was adequate, and her wall quadricep muscles were "perhaps" a level 3/5 on the left side and 4/5 on the right. (*Id.*). The May 2015 exam showed some tenderness in the lumbosacral region that was worse with extension and lateral rotation, but Plaintiff had good motor strength in both upper extremities. (R. 321).[7]

In addition to his physical findings, Dr. Levinson opined that: Plaintiff suffered from depression and anxiety; her concentration and attention were frequently impacted by her fatigue and pain; and she would have a severe limitation in dealing with work stress. (R. 408-09). At the March 2015 appointment, Dr. Levinson noted that Plaintiff "complain[ed] of depressive symptoms" (despite also stating that her review of systems was negative), but Dr. Levinson documented no related observations or findings, and he noted that Plaintiff had not sought any psychiatric or psychological intervention therapy. (R. 322). Neither of the subsequent visits from April and May 2015 mention depression or anxiety (either in the form of Plaintiff's complaints or Dr. Levinson's findings), and the only other mention of them came in the appointment nearly a year later, when Plaintiff was

---

[7] Plaintiff states in a footnote (in its entirety): "When he introduced Dr. Levinson, the ALJ still neglected to mention that he is a rheumatologist." (Doc. 19, at 4 n.1). During the November 10, 2020 hearing, the ALJ specifically confirmed with Plaintiff that Dr. Levinson is a rheumatologist, and he discussed and considered all four of the doctor's treatment records. (R. 320-22, 400, 438, 440, 461).

requesting a disability form from Dr. Levinson. (R. 400). Even then, Dr. Levinson's treatment note simply reflects that Plaintiff presented with complaints of depression and anxiety (among others) and was "quite tearful throughout the interview." (*Id.*).

Other objective evidence also fails to support the mental limitations found by Dr. Levinson. As the ALJ noted, at the November 2015 consultative examination, Dr. Pimentel found that Plaintiff was alert and oriented, was able to stay on task and concentrate, and had an appropriate affect and behavior. (R. 371, 373, 439). Plaintiff denied any history or diagnosis of depression, and Dr. Pimentel noted that there were no other psychiatric disorders or abnormalities noted in the mini-mental status examination. (R. 371). He concluded that she had a "questionable history of depression." (R. 373). Additionally, while Plaintiff's treatment notes with Dr. Khankari reflect that he prescribed her Prozac as early as November 2013,[8] there are otherwise no findings or impressions related to depression or anxiety. (R. 331, 333, 335, 337-40, 380, 382, 384, 386, 410, 412, 414, 416-17, 419-23). The only reference to depression in Dr. Khankari's treatment notes appears in a June 28, 2019 visit, in which Plaintiff complained that she was "feeling depressed" and had lost her father the month before. (R. 650). As explained above, Dr. Khankari's earlier treatment notes also reflect that Plaintiff reported a good mood and that she was "overall doing well" or "generally well" at appointments in September 2012, March 2013, November 2013, April 2014, January 2015, and July 2015. (R. 331-37, 339, 341, 346). Viewing the record as a whole, the ALJ provided valid reasons for discounting

---

[8] At the November 2020 hearing, Plaintiff testified that Prozac did not help her at all and she had not taken it "in a while." (R. 462, 474).

Dr. Levinson's extreme limitations and did not err in declining to give his opinion controlling weight.

Plaintiff also argues that the ALJ once again failed to explain the weight he assigned to the opinions of the state agency consultants. In assigning great weight to the state agency' physicians' opinions in his December 2017 opinion, the ALJ stated only that the opinions "appear[ed] well supported by the evidence of record." (R. 20). According to Plaintiff, the ALJ attempted but failed to cure the problem by slightly altering that wording to state that the agency physicians' opinions "are generally consistent with the evidence." (Doc. 19, at 11). Plaintiff's characterization is inaccurate.

The ALJ gave "significant weight" to the opinions of the state agency consultants, Lenore Gonzalez, M.D. and Stephen Sutherland, M.D., and even greater weight to the opinion of Dr. Sutherland. (R. 442-43). Both consultants opined that Plaintiff has the RFC to perform light work. (R. 58-105). On reconsideration, Dr. Sutherland additionally opined that Plaintiff should avoid concentrated exposure to extreme cold, vibration, and hazards such as unprotected heights. (R. 88-89, 102-03). The ALJ recognized that neither Dr. Gonzalez nor Dr. Sutherland examined Plaintiff but explained that they nonetheless "provided specific reasons for their opinions about [Plaintiff's RFC] showing that the opinion was grounded in the evidence in the case record available at the time and [Plaintiff's] allegations about her symptoms and limitations." (R. 442). Both consultants considered Plaintiff's complaints of pain in reaching their opinions, but they also noted that the objective findings of normal gait, normal strength, and intact sensation at times appeared inconsistent with Plaintiff's allegations. (R. 61-64, 70-73, 80-88, 94-102, 442). The ALJ thus provided the "more reasoned explanation" that this Court

previously required. Moreover, the ALJ included additional postural limitations in the RFC (R. 435) beyond those found by either agency consultant, which reflected "some limited deference to [Plaintiff's] allegations to the extent that they are supported by the combined nature of the impairments including the obesity." (R. 443).

### 3. RFC Assessment

Plaintiff argues that the case still requires reversal or remand because the ALJ failed to explain how he factored all of her limitations into the RFC finding. (Doc. 19, at 11-12). More specifically, Plaintiff claims that the ALJ's RFC assessment failed to account for "any exacerbating effects of [her] upper extremity pain, depression, or obesity." (*Id.* at 11). The Court disagrees. A claimant's RFC is the maximum work that she can perform despite any limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. "[T]he responsibility for the RFC assessment belongs to the ALJ, not a physician, [but] an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Anna-Marie L. v. Kijakazi*, No. 21 C 50354, 2022 WL 4610120, at *2 (N.D. Ill. Sept. 30, 2022) (quotations and citation omitted).

Looking first to Plaintiff's alleged "upper extremity limitations," Plaintiff contends that the ALJ erred by omitting any limitation in handling and fingering from his RFC assessment. (Doc. 19, at 13). The ALJ recognized that the November 2015 consultative exam revealed reduced grip strength (3+ out of 5 in both hands) and no more than mild difficulties with fine and gross manipulative movements of the hands and fingers, which he determined would not preclude work at a light exertional level. (R. 377, 439, 442). While Plaintiff points to her own reports of pain and some findings of tenderness and limited extension and range of motion during physical exams (Doc. 19, at 12)—all of which

the ALJ acknowledged—she does not identify any doctor who opined that a handling and fingering limitation was necessary.   The state agency physicians, who reviewed the consultative exam's finding that Plaintiff's ability to lift, carry, and handle objects was impaired due to her fibromyalgia, determined that Plaintiff has no such limitation.  (R. 63-64, 72-73, 81-88).  As the Commissioner notes, even Dr. Levinson did not opine as to such a limitation; when asked to identify Plaintiff's location(s) of pain, he omitted her hands and fingers altogether and did not identify any specific functional limitations related to manipulation.  (R. 408).  At most, Dr. Levinson noted that Plaintiff had pain in her arms and would be limited as to "repetitive movement" writ large (R. 408-09), but he did not specify any limitation in handling and fingering.   "[C]ourts within this Circuit have repeatedly held that '[t]here is no error' in the formulation of an RFC 'when there is no doctor's opinion contained in the record [that] indicates greater limitations than those found by the ALJ.'"  *Hosea M. v. Saul*, No. 18 C 2926, 2019 WL 5682835, at *7 (N.D. Ill. Nov. 1, 2019) (quoting *Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018)).[9]

Beyond this, Plaintiff appears to argue that the ALJ was required to incorporate a handling and fingering limitation in the RFC because he posed a hypothetical to the VE involving such a limitation at the November 2020 hearing.  (Doc. 19, at 13).  It is true that, after posing a series of hypotheticals to the VE, the ALJ posed an additional hypothetical involving a limitation to frequent, but not repetitive, handling and fingering.  (R. 483).  In response, the VE stated that "[t]he required frequent handling and fingering . . . would be

---

[9]     Plaintiff expressly contends that a "handling and fingering" limitation is warranted.  (Doc. 19, at 13). However, because Plaintiff also lists her alleged limitations related to reaching and extending (*id.* at 12), it is unclear if Plaintiff also intended to argue that these limitations should be included as well. To the extent that Plaintiff believes that a reaching, extension, or any other upper-extremity related restriction is warranted as well, the Court's analysis above regarding handling and fingering remains substantively unchanged, as no doctor opined that such additional restrictions were necessary.

repetitive." (*Id.*). The VE also confirmed that a limitation to only occasional handling and fingering would rule out Plaintiff's past work. (R. 484). According to Plaintiff, the ALJ, therefore, erred in ultimately declining to incorporate any handling and fingering limitation in the RFC. (Doc. 19, at 13). Plaintiff is mistaken.

"[T]he Seventh Circuit has stated that, when an ALJ omits from the RFC a limitation that was presented in a hypothetical to the VE, there is no error if the hypothetical posed a more restrictive limitation than what was supported by the record." *Jolene C. v. Saul*, No. 20 CV 50219, 2021 WL 2156426, at *6 (N.D. Ill. May 27, 2021) (citing *Vang v. Saul*, 805 F. App'x 398, 402 (7th Cir. 2020)). "Relatedly, courts in this circuit find that, if an ALJ ultimately determines that a hypothetical posed to a VE does not accurately reflect the plaintiff's limitations, the ALJ is not required to discuss the testimony or explain the reasoning for rejecting it." *Id.* (citing cases); *see also Latowski v. Barnhart*, 93 F. App'x 963, 974 (7th Cir. 2004) ("[T]he ALJ committed no error in declining to analyze the vocational expert's response to the second, more restrictive hypothetical because that hypothetical was based on limitations the ALJ justifiably rejected."). As discussed above, no doctor opined that a fingering and handling limitation was necessary, and the ALJ concluded that such a limitation was not supported by the record, as reflected by his rejection of Dr. Levinson's opinion regarding a "repetitive movement" limitation and the RFC assessment finding that Plaintiff was capable of light work with only environmental and postural limitations. The ALJ thus did not err in declining to incorporate a handling and fingering limitation in the RFC.

Next, Plaintiff claims that the ALJ acknowledged but ultimately ignored her obesity when formulating the RFC. (Doc. 19, at 13). The ALJ considered Plaintiff's obesity

pursuant to SSR 19-2p, found that it is severe, and expressly considered how it combines with her other impairments. (R. 433-34). Specifically, the ALJ stated that he considered both "how weight affected [Plaintiff's] ability to perform routine movement and necessary physical activity within the work environment" and "any added or accumulative effects [Plaintiff's] obesity played on the ability to function, and to perform routine movement and necessary physical activity within the work environment." (R. 434). Beyond this, and contrary to Plaintiff's assertion that the ALJ "ultimately ignored" her obesity, the ALJ incorporated several postural limitations contemplated by SSR 19-2p into the RFC (*e.g.*, limitations on climbing, stooping, kneeling, crouching, and crawling), which were greater than the limitations assessed by the state agency reviewers. (R. 435, 443); *see* SSR 19-2p, 2019 WL 2374244, at *4 (May 20, 2019) (obesity may result in "limitations in the nonexertional functions of climbing, balancing, stooping, kneeling, crouching, and crawling"). The ALJ made clear that he incorporated these additional postural limitations in the RFC in recognition of Plaintiff's allegations "to the extent that they are supported by the combined nature of [her] impairments including [her] obesity." (R. 443). The ALJ adequately considered and accounted for Plaintiff's obesity in the RFC.

The Court thus disagrees with Plaintiff that the ALJ failed to build a logical bridge from the evidence to conclusion in considering her obesity. (Doc. 19, at 13). Even if Plaintiff were correct, any such error would be harmless. Not only did the ALJ incorporate functional limitations greater than those suggested by the state agency reviewers, who were aware of Plaintiff's obesity (R. 58-105), but Plaintiff fails to identify any additional limitations that the ALJ should have imposed because of her obesity. *See Mitchel A. v. Saul*, No. 19 CV 1757, 2020 WL 2324425, at *10 (N.D. Ill. May 11, 2020) (finding any

26

error in ALJ's consideration of claimant's obesity harmless where claimant "ma[de] no attempt to explain what additional limitations should have been imposed because of his obesity"); *Hernandez v. Astrue*, 277 F. App'x 617, 624 (7th Cir. 2008) (finding harmless error when plaintiff "did not articulate how her obesity exacerbated her underlying conditions" and "the ALJ demonstrated that he reviewed the medical reports of the doctors familiar with the claimant's obesity").

Finally, as to her depression, Plaintiff contends that the ALJ "failed to account for the interplay between [her] depression and her pain." (Doc. 19, at 14). In particular, Plaintiff proposes that the "considerable emotional overlay" documented by Dr. Levinson "likely exacerbates her limitations." (*Id.*). But the ALJ considered Plaintiff's depression in relation to her fibromyalgia. (R. 439). As explained above, the ALJ found Dr. Levinson's opinion regarding Plaintiff's mental limitations unpersuasive given that he never documented any findings related to her depression in any of his treatment notes. Nor did Dr. Khankari make any findings related to Plaintiff's depression. And the consultative examiner found only a "questionable history of depression." (R. 373). Plaintiff points to no other doctor who opined that Plaintiff had any functional limitations stemming from her depression that would impact her ability to work.

In sum, Plaintiff has failed to demonstrate that her alleged upper extremity limitations, obesity, and depression support any additional limitations beyond those in the RFC finding, and the Court declines to remand on this basis.

### 4. Step Four Finding

Plaintiff finally argues that the ALJ erred at step four by failing to support his finding that Plaintiff could perform her past work as a claims clerk. (Doc. 19, at 15-16). Plaintiff

27

reiterates her own testimony regarding her purported limitations in walking, standing, sitting, rising, typing, grasping, holding, and reaching (*id.* at 15) and claims that the ALJ did not explain how someone with such "described deficits" would be able to sustain her prior work as a claims clerk. (*Id.*). "At step four, 'the burden of proof rests on the claimant to establish that she is not capable of performing her past work.'" *Jill A. W. v. Kijakazi*, No. 20 C 3854, 2023 WL 2954919, at *3 (N.D. Ill. Apr. 14, 2023) (quoting *Sevec v. Kijakazi*, 59 F.4th 293, 300 n.35 (7th Cir. 2023)).

Here, the ALJ relied on the VE's testimony in finding that Plaintiff could perform her past relevant work as a claims clerk. (R. 443-44, 482-83). When the ALJ asked the VE whether an individual with the RFC assessment formulated by the ALJ (*i.e.*, a restriction to light work and certain environmental and postural limitations) could perform Plaintiff's past work as a claims clerk, the VE responded that she could. (R. 482-83). Plaintiff does not identify any specific errors with this exchange, but instead appears to suggest that the ALJ erred in concluding that she could perform her past relevant work because the ALJ did not include additional functional limitations in the RFC. Because the Court has already found that the ALJ did not err in declining to include the additional limitations proposed by Plaintiff (*see supra* Section 3), this argument has no merit.

## **CONCLUSION**

For reasons stated above, Plaintiff's request to reverse or remand the ALJ's decision is denied and the Commissioner's Motion for Summary Judgment [26] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: June 2, 2023

_Sheila Finnegan_
SHEILA FINNEGAN
United States Magistrate Judge